**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 2:17-cr-00027-3 |
| | ) | |
| MICHELE LYNN CONNELL, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ENTERING A VERDICT OF
GUILTY AS TO COUNT THREE OF THE INDICTMENT AS TO DEFENDANT
MICHELE LYNN CONNELL**

1.      The indictment against Defendant, Michele Lynn Connell ("Defendant" or

"Connell"), charges her at its Count 3 with conspiracy to commit money laundering, by violating

Title 18 U.S.C. § 1956(h) which provides that  "Any person who conspires to commit any offense

defined in this section or section 1957 shall be subject to the same penalties as those prescribed

for the offense the commission of which was the object of the conspiracy." (ECF No. 30 at 3-4).

2.      Defendant comes before the court presumed to be innocent, a presumption that

remains in place unless the Government proves each element of the crime charged beyond a

reasonable doubt.

3.      The Indictment charges Defendant with conspiring to violate 18 U.S.C. §

1956(a)(1)(B)(i) which provides:

> § 1956. Laundering of monetary instruments
>
> (a)
> (1) Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful
> activity, conducts or attempts to conduct such a financial transaction
> which in fact involves the proceeds of specified unlawful activity—

\*   \*   \*

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

(ECF No. 30 at 3).

4. The substantive crime of money laundering includes the following elements: "(1) an actual or attempted financial transaction; (2) involving the proceeds of [a] specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) . . . knowledge that the transaction [was] designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of [a] specified unlawful activity." United States vs. Richardson, 658 F.3d 333, 337-38 (3d Cir. 2011) (quoting United States v. Omoruyi, 260 F.3d 291, 294-95 (3d Cir. 2001)).

5. In order to prove conspiracy to commit money laundering, the Government must establish the following essential elements: (1) the conspiracy, agreement, or understanding to commit money laundering was formed, reached, or entered into by two or more persons; and (2) at some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the agreement, and then deliberately joined the conspiracy, agreement or understanding. See United States v. Navarro, 145 F.3d 580, 593 (3d Cir. 1998); Whitfield v. United States, 543 U.S. 209, 211 (2005).

6. More specifically, the Government must prove beyond a reasonable doubt that two or more people agreed to launder money as charged in the indictment; that is they agreed to conduct or attempt to conduct a financial transaction that would affect interstate commerce, with the

proceeds of a specified unlawful activity, with knowledge that the proceeds involved some form of unlawful activity, and with knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds, (ECF No. 30 at 3);

7.      The Government must prove beyond a reasonable doubt that the defendant was a party to, or member of, the agreement and joined the agreement with at least one other person with whom they had a unity of purpose to achieve the goal of the conspiracy; and

8.      The Government must prove beyond a reasonable doubt that the defendant joined the agreement or conspiracy knowing of its objective to launder money as charged in the indictment and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective.

9.      The Court finds and concludes that the Government has proven beyond a reasonable doubt each element of the offense charged at Count 3 as to Defendant.

10.     The first element of the crime of conspiracy is the existence of an agreement. The Government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy. The Court finds and concludes that Defendant agreed with the other participant in the charged conspiracy, Richard Wright ("Wright"), and they arrived at a mutual understanding and agreement to use the proceeds of Wright's illegal drug dealing operation to fund their living expenses, along with a number of major purchases, including the joint purchase of a home in Florida, multiple vehicles, (including specifically a

3

Harley-Davidson motorcycle that Defendant desired, and as to which she and Wright agreed to the financial arrangements so that the motorcycle was paid for with what Defendant knew was the proceeds of Wright's drug dealing and using a convoluted loan/cash/Money Order purchase process concocted by Wright and agreed-to by Defendant), and that part of that agreement was the use of multiple methods to conceal and disguise the use of Wright's ill-gotten gains from drug dealing for those financial transactions, each of which affected interstate commerce.

11.    The Government does not have to prove the existence of a formal or written agreement, or an express oral agreement spelling out the details of the understanding. The Government also does not have to prove that the members of the conspiracy directly met, or affirmatively discussed between themselves their unlawful objective, or agreed to all the details, or agreed to what the means were by which the objective would be accomplished. The Government is not required to prove that all the people named in the indictment were, in fact, parties to the agreement, or that all members of the alleged conspiracy were named, or that all members of the conspiracy are even known. What the Government must prove beyond a reasonable doubt is that two or more people in some way or manner arrived at some type of agreement, mutual understanding, or meeting of the minds to try to accomplish a common and unlawful objective and that the Defendant was one of those people. The Government has proven the existence of such an agreement with Defendant as a participant along with Wright, and beyond a reasonable doubt.

12.    The Court may consider and has considered both direct evidence and circumstantial evidence in deciding whether the Government has proved beyond a reasonable doubt that an agreement or mutual understanding existed between Defendant and Wright. The Court may, and does, find the existence of the charged conspiracy based on reasonable inferences drawn from the

actions and statements of the members of the charged conspiracy (namely Defendant and Wright), from the circumstances surrounding the scheme, and from evidence of related facts and circumstances which prove that the activities of the participants in a criminal venture could not have been carried out except as the result of a preconceived agreement, scheme, or understanding. In reaching this conclusion as to Wright and Defendant, the Court has considered, in a holistic way, all of the direct and circumstantial evidence of record, including the documentary evidence introduced into the record, the testimony which the Court has found to be credible, along with the reasonable and rational inferences the Court has drawn from the evidence as are embodied in the findings set out in this document. To the extent any finding is inaccurately denominated as a conclusion of law, or vice versa, the Court states that it is its intention that each such matter be correctly denominated, and as necessary, any inaccurate denomination is deemed so corrected for accuracy of its labeling.

13.    The Court having found that a criminal agreement or conspiracy existed, then to find Defendant guilty of conspiracy the Court must also find that the Government proved beyond a reasonable doubt that she knowingly and intentionally joined that agreement or conspiracy during its existence with the intent to commit the underlying money laundering crime as charged to be the object of that conspiracy and knowing that such was the purpose of the conspiracy. The Court finds and concludes that the Government has done so beyond a reasonable doubt.

14.    The Government need not prove that Defendant knew everything about the conspiracy or that she knew everyone involved in it, or that she was a member from the very beginning. The Government also does not have to prove that Defendant played a major or substantial role in the conspiracy. But here, the Court finds that she did have such knowledge and

acted in a substantial way in furtherance of that conspiracy, particularly but not limited to (separately and distinctly but also as part of the larger conspiracy) the purchase of a home in Florida by her and Wright, the defeasing of a mortgage loan on a residence of Defendant in Virginia, the purchase of automobiles and trucks, and the purchase of a Harley-Davidson motorcycle that she desired, all as set out below.

15.    The Court finds that the Government has proven all of the elements of the charged conspiracy beyond a reasonable doubt. Defendant was well aware of the nature and scope of Wright's drug dealing operation and at times personally observed some of his illegal activities. She entered into specific arrangements and agreements with Wright for him to fund the referenced purchases and expense payments for her benefit, or their mutual benefit, knowing that his funding was in substantial part from the proceeds of his illegal drug dealing, and intending to consummate the financial transactions with such proceeds, disguising the source of the same.

16.    The Government need not prove an overt act in order to obtain a conviction under 18 U.S.C. § 1956(h). Whitfield, 543 U.S. at 214. That said, as set out below, Defendant and Wright were co-conspirators, and each committed the stated numerous overt acts in furtherance of the conspiracy charged. Further, many of the overt acts of Wright, done in furtherance of the conspiracy and during its existence, were well and actually known to Defendant, and known to have been committed to further their agreement as to the concealment of the use of drug dealing proceeds in the involved financial transactions. That Defendant allegedly did not personally commit all overt acts, particularly in terms of personally making monetary deposits/withdrawals from bank accounts, endorsing checks or Money Orders, or personally and physically purchasing Money Orders as she argues, is beside the point, as Wright's commission of the multitude of overt

6

acts proven at trial during and in furtherance of the charged conspiracy would suffice to fulfill an "overt act" requirement if such a requirement existed.

17.    "Direct evidence of an agreement is not necessary as each element of a criminal conspiracy 'may be proven entirely by circumstantial evidence.'" United States v. Davis, 373 F. App'x 239, 242 (3d Cir. 2010) (non-precedential opinion) (citing United States v. Applewhaite, 195 F.3d 679, 684 (3d Cir. 1999)).

18.    The Government has proven beyond a reasonable doubt that Defendant knew the goal or objective of the agreement or conspiracy here, and voluntarily joined it during its existence, intending to achieve the common goal or objective and to work together with at least one other alleged conspirator (specifically Wright) toward that goal or objective. She was an active participant in the key agreements here, including but not limited to buying the home in Florida paid for in whole or substantial part with drug dealing proceeds, the purchase of vehicles, the payments toward the mortgage on her Virginia house, and the motorcycle purchase noted above.

19.    Defendant was not simply a bystander to or observer of "bad conduct" by Wright and his drug dealing confederates, nor was she simply "keeping bad company" with a person engaged in criminal conduct, nor was she simply the unwitting beneficiary of large amounts of financial largesse by Wright. To the contrary, she knowingly entered into an overall arrangement containing specific plans for the use of drug dealing funds to engage in the financial transactions set out in these findings, and Wright in particular with the actual knowledge of Defendant that she and Wright engaged in multiple overt acts in furtherance of the agreements between Defendant and Wright to launder funds derived from drug dealing by making otherwise lawful purchases, involving multiple financial transactions, all in and affecting interstate commerce.

20.     In this prosecution, the Government must also prove beyond a reasonable doubt is that Defendant conspired to conduct one or more financial transactions.

21.     The term "conducts" includes initiating, concluding, or participating in initiating or concluding a transaction.

22.     The term "transaction" means a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition of property. With respect to a financial institution, the term "transaction" means the deposit, withdrawal, transfer between accounts, or any other payment, transfer, or delivery by, through, or to a financial institution by whatever means effected.

23.     The term "financial transaction" means any "transaction" that in any way or degree affects interstate or foreign commerce and involves the movement of funds by wire or other means, or involves one or more monetary instruments, or involves the transfer of title to any real property, vehicle, vessel, or aircraft; or involves the use of a financial institution that is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

24.     The term "interstate commerce" means commerce between any combination of states, territories or possessions of the United States, including the District of Columbia.

25.     Further, the Government is not required to prove that Defendant knew of or intended the effect on interstate commerce but must merely prove that such an effect occurred. The Government has done so beyond a reasonable doubt.

26.     The Government is not required to prove that Defendant's transactions with or via a financial institution themselves affected interstate or foreign commerce. The Government is only required to prove that the financial institutions or banks through which the financial transactions were conducted were engaged in or had other activities which affected interstate or foreign

commerce in any way or degree. That said, as set out in detail below, many of the financial transactions involving Defendant and/or made in furtherance of her agreements with Wright actually moved in and affected interstate commerce, and Defendant was well aware of that fact and personally made or facilitated a number of them. The Government has proven this element beyond a reasonable doubt.

27.     The term "proceeds," means any property, or any interest in property, that someone acquires or retains as a result of criminal activity. Proceeds may be derived from an already completed offense or from a completed phase of an ongoing offense.

28.     The Government is not required to prove that all of the funds involved in any charged transaction were the proceeds of the specified unlawful activity. A financial transaction involves "proceeds" of a specified unlawful activity even when proceeds of a specified unlawful activity are commingled in an account or otherwise with funds obtained from legitimate sources. It is sufficient if the Government proves beyond a reasonable doubt that at least part of the funds involved in a transaction represents proceeds of specified unlawful activity. Among the financial transactions personally engaged in by Defendant were the Florida house purchase, and the motorcycle purchase.

29.     As a matter of law, the term "specified unlawful activity" includes a violation of the law involving the possession of powder or crack cocaine with the intent to deliver the same, including Wright's drug dealing activities.

30.     The Government has proven beyond a reasonable doubt Defendant personally engaged in, and also agreed that Wright would engage in, financial transactions that in whole or in material part involved drug dealing money. Many of those transactions actually involved the

movement of funds from state to state, particularly between Pennsylvania and Florida, but in any event, they were of a nature and scope that necessarily affected, and did affect, interstate commerce.

31.     The Government alleges in this case that the specific unlawful activity from which proceeds were derived was co-Defendant Wright's illegal distribution of powder and crack cocaine during the time frame of in or around 2011 to January 11, 2017. As set out at length below, Defendant and Wright knowingly engaged in numerous financial transactions in and affecting interstate commerce. Defendant and Wright did so with the knowledge that these transactions involved the proceeds of Wright's large-scale drug operation, with the intent to disguise or conceal the illegal source of the funds, and in furtherance of their agreements to do the same.

32.     This matter came before the Court for a bench trial, which covered two days of testimony. Among the witnesses testifying at trial was Defendant. All witnesses were duly sworn, and subject to examination by all parties, and as appropriate, to follow up questioning by the Court. Unless otherwise set forth further in these Findings and Conclusions, the Court found the testimony of each witness to be credible, based on the Court's full consideration of the factors ordinarily employed to assess witness credibility, including but not limited to the inherent believability of the testimony, its internal consistency along with its consistency (or not) with other evidence of record, the interest (if any) that the witness had in these matters and their outcome, along with the Court's personal observation of the presence and demeanor of each witness. As set out more fully below, the Court found much of Defendant's testimony to be evasive and/or non-responsive to the question posed, and/or inherently incredible, and not worthy of credence as to her denials of facts that generated her culpability. As further noted below, on several key points, including knowledge

of Wright's drug dealing and the specifics of Defendant's engagement with Wright as to the Florida home, Defendant's testimony was actually self-incriminating.

33.    The Court also received into the record multiple thousands of pages of physical exhibits, admissible summaries of many of them, along with stipulations of the parties. (ECF No. 320 at 163-67). The documentary evidence of financial transactions admitted into the record and considered by the Court all involved the time period of the charged conspiracy. (ECF No. 321 at 5). In making and reaching these Findings and Conclusions, the Court has considered only evidence that was properly admitted into the record and the reasonable inferences drawn from the same and has given no consideration or weight to any matter that would be inadmissible under any rule or provision of law.

34.    At the conclusion of the bench trial, the parties requested that rather than the Court rendering its verdict orally without findings, that it do so by issuing written findings and conclusions. Fed. R. Crim. P. 23(e). The parties requested and were provided with the opportunity to file proposed findings and conclusions for the Court's consideration. At the request of counsel, the Court extended the time for the filing of the same.

35.    All trial proceedings were duly transcribed by an official Court Reporter, and the transcripts of such were available to all parties and to the Court. The Court has considered that transcribed testimony in its consideration of the record and in particular the submissions of the parties. The Court has also relied on its clear memory from and of the trial proceedings, its own copious notes of the trial proceedings, along with its contemporaneous assessments of such proceedings, including the testimony of each witness.

36.    The central genesis of this criminal case stems from the relationship between Defendant and co-Defendant Wright, along with her and his interactions with various confederates of Wright in the extensive and extended cocaine (powder and crack) dealing operations that Wright led for many years and which involved large volumes of cocaine and the resulting cash attendant to the drug transactions that he spearheaded. The Court specifically finds and concludes that Wright was a major cocaine dealer, and that Defendant knew this, at every step along the way, and for the duration of the charged conspiracy. The charge against Defendant is based on the Government's premise that Defendant was well aware of Wright's drug-dealing activity and the huge financial rewards (usually in cash) generated by that plainly illegal activity; that Defendant actively agreed with and participated with Wright in laundering the fruits of Wright's drug dealing by and through a variety of financial transactions, machinations and activities in and affecting interstate commerce, including the persistent use of cash and U.S. Postal Money Orders. The Court finds all such matters to be the case beyond a reasonable doubt.

37.    Wright pled guilty to lesser included offenses to Counts 1, 2 and 3 of the Indictment. He died before he was sentenced.

38.    It appears that the primary thrust of the defense position in the case is that while Defendant had an intimate and then marital relationship with Wright; she was, as a factual and legal matter, a "stranger" to his drug dealing and the financial fruits of it; that she was an educated professional in her own right; that she lawfully earned income from her own labors and lawful activities; that she maintained separate and distinct financial accounts from Wright; and that any financial transactions in which she was engaged were not part and parcel of any conspiracy with Wright to launder money from his drug dealing. Further, she appears to at least implicitly contend

that to the extent that Wright engaged in interstate financial transactions involving the proceeds of his drug dealing operation, and as to which she benefitted, such were wholly gratuitous by Wright; that she had no agreements with Wright regarding the same; and that, in any event, she had no knowledge of the reality that Wright's illegal drug dealing was the source of the funds used to support those financial transactions. (ECF No. 321 at 139-52).

39.    The Court rejects that position of Defendant as inconsistent with the evidence in this case. Defendant was shown by the evidence to be a highly educated person who carried professional responsibilities as a patent agent for a law office in Northern Virginia. For Defendant to have been blind to what Wright was doing, the source of the cash found in the home they shared (including in Defendant's bedroom), and the plethora of major purchases made to benefit Defendant alone, or Defendant and Wright jointly (including his monthly payments to defease two mortgages in amounts many multiples of the fixed loan payments), would be and is wholly inconsistent with the education and professional responsibilities Defendant advanced at trial. Further the compelling evidence, including Defendant's own testimony, demonstrated that she was right in the thick of the Florida house financial transaction, she fronted money toward it, and expected to be and was repaid the fronted money by Wright with cash resulting from his drug dealing. In short, her position in these regards does not hold water, and is rejected by the Court. As set out below, Defendant well knew what Wright was doing in such regards, she agreed with him as to the arrangements for the financial transactions noted herein, and she well knew that the source of a major portion of Wright's money used to fund a wide variety of financial transactions was his illegal drug dealing.

40.    Further, for Defendant to not have been actually aware of the use of Wright's drug dealing proceeds to fund in whole or in part the major purchases set out below would have required Defendant to have deliberately closed her eyes to what would have been obvious to her or anyone else in the same circumstances. And no person can avoid criminal responsibility by deliberately ignoring what is obvious. Here, at least the following things were obvious to Defendant: Wright's drug dealing, which she admitted she was aware he had re-started and which she was aware of for months before law enforcement raided and searched the residence she shared with Wright; her presence when drug deals were being "done" by Wright and a confederate; her theft and use of cocaine from Wright's inventory; and Wright's accumulation of vast amounts of currency beyond any lawful income of Wright, along with Wright's cash purchase of Postal Money Orders which were then used to fund loans taken out by Defendant along with major purchases that she arranged, often in monthly amounts many thousands of dollars above and beyond the required loan payment amounts. Her conduct went far beyond her simply disregarding information that created a high probability of illegal activity, nor was she simply foolish or stupid, nor were her actions inadvertent or accidental; Defendant took intentional actions that demonstrated the existence and source of the money Wright supplied to the financial transactions engaged in here, and her agreement with Wright as to the arrangements set out herein. This is all particularly true as to the Florida house purchase financial transaction, the pay down of the mortgage on her Virginia home, and the purchase of a Harley-Davidson motorcycle she desired, all as more fully detailed below.

41.    Both at trial and in her proposed findings as submitted to the Court, a central focus of Defendant's case was that the Government did not present *documentary* evidence of Defendant's signature on involved financial paperwork, or relative to the purchase of most of a

copious amount of Postal Money Orders which were used for a wide range of financial transactions, including paying toward the purchase of a home by Wright and Defendant in Florida, the purchase of a wide range of household goods, the purchase and loan payments on a plethora of cars and other vehicles, and specifically the purchase of a motorcycle by and for the use of Defendant.

42.    While such may to a degree be true as far as it goes, that argument misses several points that the evidence plainly demonstrates beyond a reasonable doubt and as set out above and below. First, there is plenty of record evidence, including statements of Defendant herself, regarding her broad and detailed actual personal knowledge of Wright's drug dealing operation, his propensity to glean, accumulate and then spend vast amounts of U.S. currency generated by that operation, his use of cash and Postal Money Orders (rather than checks or wire transfers from bank accounts) to purchase a wide variety of items for the mutual benefit of Defendant and himself, to defease her debts, to purchase multiple motor vehicles, to pay toward the Florida home that he and Defendant agreed with one another to buy and did buy, to fund the purchase of the Harley-Davidson motorcycle Defendant desired and bought and which Wright paid for, along with an array of household goods, including some for that Florida house. Second, as noted below, there was plenty of evidence that even if all of Defendant's and Wright's lawful income is accounted for, at least nearly $200,000 in funds for expenditures involving such financial transactions remains unexplained, except by virtue of it being tied back to Wright's use of cash (and Postal Money Orders) paid for with drug sales proceeds for such financial transactions. Third, there is no question that Defendant was intensely and personally engaged in a common plan, scheme and agreement with Wright to purchase a home in Florida, to pay or "front" the large ($40,000) down

15

payment on that real estate purchase with funds from her bank account and moving in interstate commerce, with the agreement and expectation that Wright would reimburse her, and that Wright did reimburse her with $40,000 in cash which she well knew was derived from Wright's drug dealing.

43.    In light of what the evidence does show, the fact that the Government did not by direct evidence tie Defendant to her personal purchase of most (but not all) of the referenced assets by cutting her own personal checks or personally purchasing Postal Money Orders, does not obviate the Court's determinations as set forth herein. Further, that the Government did not generate evidence of her personal transfer of cash to pay various large debts, simply is not dispositive of the ultimate disposition of this matter. The charge against Defendant at Count 3 is one of conspiracy, as to which the core element is an agreement as opposed to the personal acts of Defendant. Her position misses the larger point amply demonstrated beyond a reasonable doubt by the direct and circumstantial evidence of what Defendant actually knew and did—that Wright for years ran a large-scale illegal cocaine distribution and sales business right in front of Defendant, that it generated huge quantities of cash (large amounts of which were found in her bedroom and purse among other places), that Defendant personally and actually knew of all of that, that she was present with and personally possessed some of such cash proceeds, that all of this was laid out before her eyes for years in the home in which she lived with Wright, and that she and Wright led their mutual lives with a common financial base anchored in their agreement to fund their life and lifestyle by Wright using cash and Postal Money Orders derived from his drug dealing. And her testimonial disclaiming of knowing where Wright was getting the money he used to make payments is simply and wholly incredible when the Court considers the record as a whole.

16

44.    Both Defendant and Wright had some lawful income, and this lawful income likely contributed—at least to some extent—to supporting Defendant's life and the life of the Wright/Defendant household. But this is not at all inconsistent with Defendant's knowing participation in the charged conspiracy. Two things can be true at the same time. It is true that Defendant earned lawful income. And it is also true that Defendant knew about and relied on the significant cash proceeds of Wright's drug operation; that Defendant, with knowledge and with the requisite criminal intent, participated in multiple interstate financial transactions involving these illegal proceeds; and that Defendant did all of this pursuant to an agreement she had with Wright to engage in these financial transactions and to conceal the source of the funds used.

45.    The Court finds and concludes that the Government has carried its burden to prove beyond a reasonable doubt each and every element of the charged offense at Count 3 as to Defendant.

46.    In all such regards, the Court makes the following non-exclusive findings and reaches the following non-exclusive conclusions, each such finding and conclusion being reached and made beyond a reasonable doubt, considering all admissible direct and circumstantial evidence of record, and the reasonable inferences that the Court draws from its consideration of the same. The Court rejects Defendant's denials of culpable conduct, as the evidence proven beyond a reasonable doubt demonstrates that such is not plausible or tenable when considered in the context of the admissible evidence and the rational and logical inferences the Court draws from them.

47.    Defendant met Wright and developed a romantic relationship with him in the early 1990s.

48.     Wright was in the business of illegally selling powder cocaine along with what is commonly called crack cocaine. Each is a controlled substance under federal law. Wright's possession and sale of those substances were violations of federal law.

49.     During the time frame of the Indictment, Wright was involved in a very successful and profitable drug dealing scheme. During a substantial portion of that time frame through its end point, Defendant was well aware that Wright was continuing his drug dealing, personally observing that activity on a number of occasions. She participated in and benefited from the flow of illegal drug deal-derived cash in the form of cash-laden envelopes tucked in her purse, bundled cash in her bedroom dresser, and large amounts of cash strapped into sorted bundles stashed in a cardboard box given to her as repayment by Wright for her down payment toward the purchase of a home in Florida for her and Wright. Defendant was also in fact personally using cocaine derived from Wright's illegal activities during this time.

50.     At the time, Defendant already had a son from a previous relationship. It does not appear that he was involved in this case.

51.     After approximately three years as a couple with Wright, Defendant became pregnant. She bore their son named Randall.

52.     Defendant's relationship with Wright deteriorated and she left him and moved in with her father.

53.     After Randall was born, Defendant moved to Ohio for a year and a half. She and her children then moved to Virginia in 1997.

54.     Upon arriving in Virginia, Defendant matriculated at George Mason University.

55.    While in Virginia, Defendant sought child support from Wright and she was awarded $165 per month in such, along with arrearages. She bought a home in Springfield, Virginia which purchase was facilitated by a PNC mortgage.

56.    Around Thanksgiving, 2011, Randall began asking questions about Wright. Defendant arranged for Randall to meet with Wright when she was in Pittsburgh to spend Thanksgiving with her sister.

57.    Defendant testified that around Thanksgiving of 2011 she met Wright at a local restaurant at which time she testified "as far as I knew, he was still doing all of the same old stuff and there was no way I was allowing my child anywhere near that. . . ." The Court finds and concludes that Defendant's use of the phrase "same old stuff" was an express reference to Wright's large cocaine dealing operations, and that such was well known to Defendant in both content and scope.

58.    During the meeting, Defendant reconnected with Wright, and Wright appeared to want a relationship with Randall.

59.    Defendant and Wright began to communicate regularly but she continued to live in Northern Virginia.

60.    Defendant graduated from George Mason University and began working as a patent agent with a law firm in Northern Virginia.

61.    Eventually, Defendant moved in with Wright at a residence on Wenzell Avenue in Pittsburgh, PA. They later married one another. They lived together during at that residence the period of the charged conspiracy.

62.     Wright and Walter Amman had a long friendship of more than 50 years, one that eventually involved Amman assisting Wright in Wright's drug distribution and sales operations, including distribution of cocaine. Part of that distribution and sales activity involved Wright driving to various customer locations and delivering drugs from his car directly to customers while at the same time receiving cash payment for the drugs. These exchanges were typically as simple as an envelope containing drugs being passed in exchange for an envelope containing the cash payment for the drugs. This car delivery activity made the drug and cash exchanges easily visible to Amman who was seated in the car. Defendant was aware of Amman, his relationship with Wright, and with at least his more recent drug dealing activities on behalf of Wright's operations. Often Defendant was in the car with Wright and Amman when these drug deliveries occurred, and she knew what was happening on those occasions. (ECF No. 320 at 48-52). The Court found all of Amman's trial testimony to be credible.

63.     Amman was eventually arrested and pled guilty to Counts 1 and 2 of the Indictment for his part in the drug distribution activity. He was later sentenced on those charges. He testified credibly at trial in this case. (ECF No. 320 at 44-52).

64.     Amman had been dealing drugs with Wright since at least the 2013-2014 timeframe.

65.     Amman and Wright distributed at least five (5) to ten (10) kilograms of cocaine (or more) during this time period.

66.     Amman testified that Wright bought vehicles for his children and grandchildren.

67.     Amman testified that he believed Wright also bought a bar for Wright's son, Brian.

68.    Amman testified that Wright financially "helped his kids out" and that he frequently gave them money and bought them other things.

69.    Amman testified that Wright also helped Defendant out the same way.

70.    As part of Wright's drug dealing operation, he at times took third-party checks from drug purchasers in exchange for drugs. That is, these checks were made out to the drug purchaser by a third-party, and the purchaser then transferred such checks in payment for the drugs from Wright. One such individual that Amman came to know was known as "Dino."

71.    Dominick Abbandanzo was "Dino" and was a cocaine customer of Wright who often signed over his paychecks in exchange for drugs. The total value of checks signed over from Abbandanzo that made their way into accounts of Wright or Defendant was $97,775.12 over the period March 2012 through to October 2016.

72.    The approximately 129 checks written to Dominic Abbandanzo by third-parties and were deposited into various PNC accounts controlled by Wright, and eleven (11) of them were deposited into the PNC account in Defendant's name. Of those eleven (11) checks, two (2) of them contain Defendant's actual signature on the back of the check. The remaining nine (9) checks contain Defendant's name, but the endorsements are in Wright's handwriting. (ECF No. 321 at 167).

73.    Based on its consideration of the entire body of evidence, the Court finds and concludes that with respect to Defendant, Wright was not circumspect at all in concealing or secreting the mechanics of his drug dealing business, and that while Defendant may not have been in on, or even aware of, every nuance of the mechanics of the drug dealing, Wright's mode of operation was open to her, was not concealed and she was well aware and knew of its nature, scope

and operation. The Court further finds that Defendant and Wright knew of and agreed to the process involving "Dino's" checks. And at least some of them were deposited into a bank account in Defendant's name, (ECF No. 320 at 192), and the analysis of the relevant bank records showed that at least $60,000 in cash was deposited into bank accounts of Defendant and could not be tied back to any legitimate sources of funds. (ECF No. 320 at 195).

74.     Amman was acquainted with Defendant both from her presence in Wright's life over the years and from around the time that Randall had turned 18 (which was during the period covered by the Indictment). Defendant would also from time-to-time ride along on Wright's drug dealing car deliveries, and the drug dealing activity was then in her full view.

75.     Amman also testified that Defendant was present when Wright made drug deliveries.

76.     According to Amman, these deliveries witnessed by Defendant occurred when Wright, Defendant and Amman went to lunch or dinner and Wright made a drug delivery on the way to or from lunch or dinner. (ECF No. 320 at 48-49).

77.     Amman testified that Defendant was present for actual drug dealing activity after the time she and Randall moved in with Wright, and Defendant confirmed that Wright was still engaged in drug dealing when she saw activities that aroused her suspicion, and she eventually found and stole and used some cocaine that was Wright's.

78.     Defendant had herself been a drug abuser in years past and Wright had been her drug supplier. She self-identified as a drug addict and alcoholic who was supplied with cocaine by Wright when she first met him through Wright's daughter in the early 1990s. She had eventually left Pittsburgh in that earlier time frame because Wright refused to stop selling cocaine.

22

79.     After she again moved in with Wright, Defendant became aware that he was still dealing drugs when she "figured out what was going on." She acknowledged that at some point "it became obvious" "because he could only explain away people coming over and me finding a package[.] . . . I mean you can only do that once or twice, you know, before I'm not going to believe you." She acknowledged that she was "very suspicious for a long time" and that eventually she found cocaine that she "stole from him." (ECF No. 321 at 188-89, 202).

80.     Amman overheard Defendant "scream[ing] at him [Wright] about she took her money out of the bank so she could put a down payment on a house, and he was supposed to give her the money back, and she knew he was making – he had that drug making money, that she wanted her money back." The Court finds and concludes that such is credible evidence of Defendant's actual knowledge of Wright's drug dealing operation, that she knew that it was the primary source of his income and financial wherewithal, and that as to the Florida house purchase described below, she fully expected to be paid back by Wright, that Defendant and Wright agreed to that arrangement, and that the source of that reimbursement to her was Wright's drug income. In the same vein, while the Defendant testified that she did not expect a reimbursement from Wright until he gave her a box of currency containing $40,000, she also admitted that she persistently brought up to Wright her making the down payment on the Florida house, in the context of what the Court finds and concludes was her expressing an expectation that Wright would make her whole for those advanced funds from his drug proceed money. (ECF No. 3231 at 174-75). From the record as a whole, the Court finds and concludes that Defendant and Wright specifically agreed that the ultimate final source of much if not all of the funding for the Florida house purchase was Wright's drug money, that they reached an agreement to so structure its

financing and purchase, and she personally engaged in financial transactions which involved the proceeds of illegal drug dealing, that the Florida home deal was structured to disguise that source of illegal funds, and that such transactions were in and affecting interstate commerce. (ECF No. 320 at 49-50; ECF No. 321 at 174-75, 188-89, 202).

81.     Defendant confirmed the substance of Amman's testimony that she and Wright argued about the approximately $40,000 she had contributed to the house purchase. This came in the context of her response to testimony about a conversation with a federal agent in which the topic of the $40,000 contribution, related to cash in a cardboard box found in the bedroom of her house, came up as "hers versus his" money. Defendant testified that "[a]nd so I became – I started telling him, what about the 40,000 I gave you for the house? I originally was saying 50. I always said 50. We did have this fight a lot. And he would be like 40, it was 40. I'm like, okay, whatever 40. . . . So he walks into the bedroom, throws this box at me and says, here's your 40,000, I don't ever want to hear about it again." The Court finds and concludes that that currency so involved was the proceeds of Wright's drug dealing operation, that Defendant well knew that, and that Wright gave Defendant that cash in furtherance of their specific agreement and her expectation by which he would reimburse her for her advance of funds to buy the Florida house with his drug sales proceeds. (ECF No. 321 at 174-75).

82.     Amman also testified that he heard Defendant accuse Wright of not paying to her money that Wright owed her for the Florida house down payment from the proceeds of his drug dealing, cash proceeds that Defendant knew that Wright possessed. Defendant corroborated Amman's testimony by stating that she acknowledged that she and Wright "did have this [$40,000] fight a lot." Defendant acknowledged telling federal law enforcement agent

Petrulak about the $40,000 payment. "I probably did say yes, well, that was repayment for my – on my – I know I did – but for part of what I paid on the house . . . This is my money, not his." (ECF No. 321 at 173-74).

83.     As set out above and below, the arrangements for and execution of the Florida house transaction and Defendant's conduct as to it fulfilled each and every element of the charged offense at Count 3 beyond a reasonable doubt, in and of itself.

84.     Wright also owned an automotive transmission repair business. Wright's daughter ran that business for some time and Wright eventually took over running the business from her.

85.     Wright also owned two rental properties in the Pittsburgh area. The Defendant disclaimed having any knowledge of the nature, location or number of such properties, and disclaimed having any idea where Wright obtained his money. (ECF No. 321 at 216-17).

86.     The federal investigation into this case, and specifically into the various financial accounts and transactions of Defendant, Wright and their relevant family members, included a review of the PNC bank accounts of Amman. Such found nothing reflective in Amman's accounts of his handling illegitimate income or other connections to the drug trafficking and money laundering activity or proceeds of the Wright drug organization. There was no record that drug money moved through Amman's bank accounts.

87.     In January 2017, a series of search warrants was executed at (a) Wright's residence located on Wenzell Avenue in Pittsburgh which included an integral garage, (b) at a detached garage referred to as "the garage" and (c) of two PNC safe deposit boxes. (ECF No. 321 at 71).

25

88.    During the search of the Wenzell Avenue residence where Wright and the Defendant lived together and "the garage," multiple quantities of illegal drugs were found. The larger quantities were found in "the garage" where it was clear that cocaine was processed and packaged. There were commonalities in the drugs found in the house (in a toilet and in an Altoids "tin" container in Defendant's bedroom dresser) and in the processing area, particularly in the labeling and packaging of sale-sized quantities with different colored ties on the clear bags (indicating different price levels for the packages) of cocaine. The Court finds that all such cocaine was part and parcel of Wright's drug dealing operation.

89.    The search revealed significant quantities of cash, much of it bundled and/or wrapped with currency straps by denomination/quantity designation, consisting of $20, $50 and $100 bills. In the bedroom used by Defendant and Wright, cash was found (a) in a cardboard box on the floor, (b) wrapped with rubber bands in the drawers of their dresser, (c) in envelopes in Defendant's purse, (d) in a gun case, (e) in a safe and (f) in other locations. Blank money orders were also found. The Court finds and concludes that all of this was in plain sight in areas that Defendant actually occupied, and all was well known to her especially given its obviousness and volume. The search and its fruits were documented in the record with photographs designated as PH-1 through PH-132. The photos were extensive and detailed and corroborated testimony introduced into the record.

90.    Larger quantities of cash were also found in the garage where evidence of Wright's drug dealing operation was found. Also found in the search was a safe with a large quantity of cash in it along with kilogram quantities of cocaine and a scale. At the time, the street value of cocaine was approximately $40,000 per kilogram. (ECF No. 320 at 90).

91.     The total drugs recovered in the search included 8.5 ounces of cocaine from the residence (an Altoid "tin" in the bedroom Defendant used and in an adjacent toilet) and approximately 10 kilos of cocaine from the garage/outbuilding. The total cash recovered was $462,075, along with $8,000 in blank money orders.

92.     White envelopes containing quantities of cash were also found in Defendant's purse.

93.     Defendant was present at the residence during the execution of the search warrant, and a federal agent interviewed the Defendant at the time the search warrant was executed.

94.     Defendant volunteered that there was $40,000 in cash in her bedroom.

95.     The agent told Defendant at that time that he believed she had assisted Wright in laundering money.

96.     Defendant denied that she illegally structured any transactions, and she told the agent that she didn't think it was right that the Government had seized money in her Bank of America account.

97.     In 2015, Defendant and Wright had decided to purchase a house in Florida from Thomas Veary ("Florida house"). It does not appear at either Wright or Defendant had any prior relationship with Veary, nor does it appear that Veary was aware of or involved in Wright's drug dealing.

98.     Veary testified that he, while serving as the executor of his father's estate, sold that residence in Florida to Defendant and Wright. It was in the names of both Defendant and Wright. (ECF No. 320 at 116).

99.     Defendant wired approximately $42,000 from her own Virginia Bank of America bank account to a closing agent in Florida to make the down payment on the Veary property. This transaction used instrumentalities of and affected interstate commerce.

100.    On June 29, 2015, Defendant made a $42,472.27 down payment to Waterside Title to purchase the Florida residence.

101.    These funds came from her Bank of America account which also contained funds she earned through legitimate employment at a law firm in Virginia. This was part of an overall financial transaction in and affecting interstate commerce.

102.    Thereafter, payments were made on the mortgage for the Florida property by the deposit of money orders directly into Veary's bank account. Veary had given the account information to Defendant who gave that information to Wright, who then made deposits into the account to pay down the mortgage, including enhanced principal payments.

103.    Defendant's relationship with Wright deteriorated in late 2016 and early 2017.

104.    Text messages established that Defendant had complained to Wright in December of 2016 about her contributing the down payment for the purchase of the Florida home from her own funds:

> So the 40 THOUSAND dollars I gave you is nothing. Lmao. U defend the people that use you and blame me for everything. I'm [sic] must be just a really horrible person . . . If I'm so awful why do u want me around . . . We're done. (ECF No. 321 at 128).

105.    As it turned out, Defendant and Wright were not "done." Shortly thereafter, after Defendant complained to Wright that he had not paid her back for the down payment she advanced, Wright gave Defendant $40,000 in cash telling her he never wanted to hear about it again.

106.    The Court finds that Defendant contributed approximately $40,000 from her own bank account toward the purchase of the Florida property. Defendant thereafter received cash back from Wright in the form of nearly $40,000 cash found in a cardboard box in the bedroom she shared with Wright at the time of its search and which he gave to her. Defendant expected to be paid back by Wright, she and he agreed that such would occur, and it did. Wright also gave Defendant $10,000 in cash which she put into her Bank of America bank account in two $5,000 deposits on June 25 and June 29, 2015 at a Bank of America branch in Daytona Beach, Florida. The Defendant expected to receive these checks as repayment to her of funds she had injected into the transaction. (ECF No. 321 at 171). The Court finds that these were financial transactions that were part and parcel of an express agreement between Defendant and Wright to do so, Defendant was by these transactions "fronting" the first tranches of cash for the Florida home purchase, money repaid to her by Wright in cash generated by his illegal cocaine sales, and Defendant actually knew all of that, agreed to that plan with Wright, and that such involved financial transactions were in and affecting interstate commerce.

107.    As the seller of the Florida property, Veary took back a mortgage that provided for a series of monthly payments ($805.23) with a large single payment ("balloon payment") at the end of the payment period ($146,265.98). The original agreement as to payment for the Florida property purchase was embodied in a document prepared for Veary by Waterside Title Company.

108.    All of the communications and agreements regarding payment for the Florida property were made by Veary with Defendant. In order to expedite the payment process, Veary provided Defendant with account information regarding an "estate account" at Bank of America into which Defendant agreed to make payments directly.

109.    During the course of the various negotiations and communications regarding the purchase of the Florida property, Veary did not have communication with Wright. Veary had email communications with Defendant, but he never had email communication with Wright. That Defendant took the lead in doing this deal was part and parcel of the agreement she had with Wright as to the nature and purchase and payment structure of that Florida house deal. She arranged the deal, worked on the paperwork that was necessary for the deal, made the down payment, and gathered and transmitted to Wright the necessary information for him to take the next steps, including paying the mortgage on the Florida house. In this way, among others, Defendant and Wright reached and carried out their agreement to launder the money generated by Wright's drug dealing via and through the Florida house purchase

110.    Veary never physically met Defendant nor Wright.

111.    Veary never received a payment in the exact stated monthly amount of $805. Instead, the first payment was for $7,000. The payments to Veary continued in that amount thereafter (amounts approximately 8.5 times the required monthly payment amount). The payments were made by Money Orders which were directly deposited into an account controlled by Veary. (ECF No. 320 at 160). Wright was the source of those payments. These were each interstate banking transactions. Because of this turn of events, Veary had Waterside Title Co. create a second amortization schedule reflecting $7,000 monthly payments. The total value of Money Orders or cash used to pay Veary (who had taken back a mortgage on the Florida house) was about $120,000. (ECF No. 321 at 35-38).

112.    Veary provided Defendant with his bank transit and account number and the mortgage payments were then made electronically to his account.

30

113.    Veary did not know who deposited the funds into his account. (ECF No. 320 at 128).

114.    Defendant was fully aware of the expenditures that Wright was making for the $7,000 monthly payments on the Florida property, that these expenditures were facilitated via deposits made by Wright into the account for which Veary had provided the necessary information to Defendant (and then provided to Wright by Defendant), and that the funds used to make them were derived from Wright's drug dealing operations. This is particularly borne out when a *lis pendens* was placed on the Florida house as result of the law enforcement investigation of this case, and Wright no longer making payments, Defendant reached out to Veary in an effort to save her interest in the Florida house.

115.    Defendant testified that she received the bank account information for the monthly payments/deposits from Veary and then passed such along to Wright. She also claimed she had nothing further to do with the payments. These arrangements were part and parcel of the agreement between Defendant and Wright as to the structure of their financial relationship and dealings in furtherance of them, they involved interstate financial transactions, and those payments were made toward the Florida house with Money Orders purchased by Wright at least in large part with cash derived from illegal drug dealings. Such was part of the agreement between Defendant and Wright to purchase the Florida house, to pay for it in this fashion, and all of that was known to Defendant. And the Florida house transaction, and the activities related to it, in and of themselves fulfill each and every element of the charged offense as to Defendant.

116.    Veary never personally interacted with Wright on any aspect of the Florida property transaction. Instead, he dealt only with Defendant. Veary relayed to her alone the

account information into which he understood the monthly payments on the mortgage were made. The Court finds that Defendant gave that information to Wright, and he made the deposits using funds derived from his drug sales, and Defendant knew all of that.

117. Introduced into the record was an Agreement for "PNC Express Storage Box" for Box #3676, bearing the name and signature of Wright (only), along with an Agreement for "PNC Express Storage Box" for Box #3721, bearing the name and signature of Defendant (only).

118. Law enforcement searched the PNC 'Express Storage Box' registered in the name of Defendant only. This box was taken out in Defendant's name in November 2013. Defendant had moved back to Pittsburgh and in with Wright some time in 2013. The "Express Storage Boxes" in this case were functionally similar in all relevant respects to a traditional safe deposit box. Those terms were often used interchangeably at trial and are so likewise noted here. The Court intends no distinction as between terms, unless specifically stated herein.

119. A manila envelope marked "Florida House Receipts" was located inside that the PNC safe deposit box in Defendant's name. The handwriting on the items found in Defendant's PNC safe deposit box does not appear to be Defendant's handwriting but instead appears to be Wright's handwriting. The Court finds that this arrangement was part and parcel of the agreements Wright and Defendant used to conceal the source of funds used in interstate financial transactions. It was Defendant's Express Box, and Wright used it to store records of the financial transactions regarding the Florida house.

120. Defendant contends that there was no evidence presented that Defendant personally placed anything inside that PNC safe deposit box or otherwise accessed that PNC

32

safe deposit box, which was in her name. But rather than exonerating Defendant as she appears to contend, these facts further demonstrate the interconnected financial dealings of Wright and Defendant, and their agreements regarding the same. Put simply, it was her box in her name, but documents generated by Wright about their joint financial transactions, including the Florida house deal that Defendant "quarterbacked," were placed in it. (ECF No. 321 at 24-34).

121.    Among the many other items introduced into the record were: PH-4 (photograph of interior of Defendant's Express Storage Box showing 8½ by 11 manilla envelopes); PH-6 (white letter size envelope from Defendant's Express Storage Box bearing the handwritten designation "Florida House Receipts"); PH-7 (smaller individual envelopes from larger letter sized envelope bearing designations "Florida House," "Bank America Jan 16," "Bank America Feb," "July House 2015," "June Fla," "July Fla," "Aug House 2015," "Sept House 2015," "Oct House 2015," "Bank America Nov," "Fla House Dec 15", "Fla House April 16," and one envelope marked "FLA");

122.    The evidence at trial also demonstrated the following:

- Exhibit SWP-1 – taken from Box #3676 (Wright's box) labeled "July House 2015" (in the handwriting of Wright); this envelope contained four (4) Postal Service register receipts – three (3) of these receipts show the purchase of two (2) Money Orders on the same receipt in denominations of $1,000; the other register receipt shows the purchase of one (1) postal money order in the amount of $1,000, for a total of seven (7) $1,000 Money Orders.

- These Money Orders were purchased with cash.

- Exhibit SWP-1 contained a customer receipt showing a deposit into what the record shows is the Veary's Bank of America bank account related to the Florida house being purchased by Defendant and Wright and in the amount of $7,000.

- Exhibit SWP-2, also taken from Box #3676, labeled as "Aug House 2015"; containing two (2) Postal Service register receipts showing the purchase of two (2) $1,000 Money Orders on each receipt (a total of four (4) money orders); this envelope also contains seven (7) Postal Service money order receipts, as well as the customer receipt, for a $7,000 deposit to a Bank of America account associated with Veary and the Florida property.

- Exhibits SWP-3 ("Sept House 2015"), SWP-4 ("Oct House 2015"), SWP-5 ("Bank America Nov"), all contained similar combinations of cash register receipts for the purchase of Postal Service money orders, Postal Service Money Order customer receipts and Bank of America customer receipts for deposits to Veary's account. (See Exs. SWP-6 through SWP-14, SWW-47, SWW-48).

123.    Bank records of Defendant and of Wright showed no checks or cash withdrawals from any bank account that would support the $7,000 per month payments going into the Bank of America account for the Florida property. It is plain to the Court that these funds were generated by cash-purchased Money Orders, and the Court finds that this cash was generated by Wright's drug sales and Defendant was well aware of such, given her personal knowledge of large amounts of otherwise undocumented cash present in her home, along with her actual knowledge of Wright's blatant and extensive illegal drug dealing, and that the payments on the Florida house were being made by Wright. It was all right in front of her.

34

124.    The Government's witness testimony about the analysis of the various bank accounts and financial records and transactions of Defendant and Wright, (ECF No. 320 at 170, 177, 181-89, 202-06, 214-18; Exs. KP-2, KP-11, KP-12), was comprehensive and in the Court's assessment credible. The testimony and records analyzed, presented, and admitted into the record covered the period of time relevant to the charged conspiracy.

125.    And the fact that documents relative to the Florida house purchase were found in both the Box registered to Defendant and in the Box registered to Wright demonstrates that the Florida house purchase was furthered and implemented by both Defendant and Wright, with Defendant arranging the deal and its documentation, and Wright funding it after Defendant fronted the down payment. In short, the evidence from the Boxes demonstrated the common engagement of Defendant and Wright in the Florida house deal, and the intermingling of their financial and other activities in furtherance of it. It was a common and agreed-upon endeavor.

126.    The Court finds from the record as a whole that Defendant had actual knowledge of the financial transactions related to the Florida property at least as follows:

- Defendant wired approximately $40,000 from her own Bank of America bank account to cause the purchase of the Florida property. (See Ex. TV-5 (containing Defendant's declaration that "I [Defendant] personally paid with my legally, hard earned money, the down payment on the property.")).

- Defendant told Veary that she and Wright had spent $300,000 on renovations to the Florida property. (See Ex. TV-4.4 (email of August 16, 2018) ("*We* have put around 300K into the house[.]"); ECF No. 320 at 124-25). Unlike the money Defendant said that she used for the down payment on the Florida property, which is identifiable in

the relevant bank records in the form of a wire transfer from her own bank account, Defendant's bank account records do not show any significant withdrawals coming out of her personal bank accounts that would support such payments totaling $300,000, nor do Wright's. The Court finds that the major portion of any such funds was money derived from Wright's illegal drug sales.

- Defendant received the necessary bank account information from Veary. She then provided the same to Wright who in turn purchased the money orders with cash and accomplished the deposits to the Veary account of and for the monthly payments of $7,000, all with funds derived from Wright's illegal drug dealing. This was a key part of the agreement between Wright and Defendant to launder drug proceeds.

- Defendant was the custodian of the records of these transactions, records which show on their face that substantial amounts of cash that was expended to accelerate the payment schedule on the Florida house. An array of distinct $1,000 Money Orders was purchased to fund those payments against the outstanding loan debt on the Florida house. Defendant's disclaimers of knowledge as to where Wright was getting the money to make the payments is incredible, since she well knew of his drug dealing but offered only vague general assertions that Wright had some rental properties, and could not offer in her testimony any credible explanation of any understanding on her part of a lawful source of such funds. The Court finds beyond a reasonable doubt that the Defendant knew that Wright was getting the money to make the $7,000 monthly payments in whole or in material part from his illegal drug dealing.

- Notably, per Postal Service procedures, Money Orders could be purchased in amounts not exceeding $1,000 each, and unless the total value purchased in a single transaction exceeded $3,000, photo identification of the purchaser was not required. (ECF No. 320 at 144, 155). The record reflects that the process used to purchase Money Orders relevant to this case involved the rapid-fire purchase of numerous postal Money Orders with transaction amounts under the $3,000 threshold at various postal locations in the South Hills of Pittsburgh (where Wendell Avenue is located) on numerous occasions. (ECF No. 320 at 137, 140-45; Exs. USPS 1-4, 4A).

127.    The $7,000 loan payments on the Florida house stopped when a *lis pendens* lien was placed on the Florida property and Veary learned that Wright was under federal criminal investigation.

128.    After these payments by Wright on the Florida house stopped, Defendant exchanged emails with Veary informing Veary that despite the federal investigation and seizure of the Florida property, Defendant still hoped to fulfill the purchase agreement. This demonstrates among other things that Defendant knew that the payments to Veary were current along the way, and only stopped when law enforcement became involved, namely the point in time when Wright's financial activities were brought to an end. And Defendant well knew that Wright was using the account information that Veary gave her, and that she gave to Wright, to make the payments on the Florida house. (ECF No. 321 at 215).

129.    Defendant disclaimed knowing the source of the money that Wright used to make those payments (and all of the others set out in these Findings), saying that Wright got the money "wherever he got it from," (ECF No. 321 at 215-17), even though she knew of the Wright's drug

dealing operations "months" before the search warrant raid on the Wenzell Avenue house, (ECF No. 321 at 202). The Court finds Defendant's denial of knowledge of the source of the cash that Wright was using to pay on the Florida house to be incredible and not worthy of belief, especially given the volume of money Wright was using to pay toward that Florida home and the physical presence of his drug dealing in the plain view of Defendant. She knew that it was drug money that paid back her down payment and was paying $7,000 per month on the Florida house purchase. And this is especially the case given that Wright was also paying $5,000 per month toward a mortgage that Defendant owed on her home in Virginia, totaling up to approximately $70,000. (ECF No. 321 at 202-03). These amounts were well beyond any amounts Wright was receiving (or could rationally be perceived from receiving) from Social Security and any rental property income.

130.    The Government proved beyond a reasonable doubt that the Florida house purchase was joint purchase/payment deal and transaction involving Wright and Defendant, as to which Defendant and Wright each agreed to engage in jointly, with each contributing money to consummate it, that most if not all of Wright's contributed money came from his illegal drug dealing, and that Defendant knew and agreed to all such matters, events, and transactions, all for the purpose of concealing and disguising the source of funds for the Florida house purchase, namely the proceeds of Wright's drug dealing, and all involving financial transactions in and affecting interstate commerce.

131.    Considering all of the evidence of record as a whole, and the reasonable inferences that the Court draws from the same, the Court finds and concludes beyond a reasonable doubt that Defendant and Wright had entered into an express agreement to combine their efforts and financial

resources to purchase the Florida house; that they did so with each engaged in and financially contributing to that purchase and related financial transactions; that the primary, if not sole, source of the cash ultimately contributed to the purchase transaction by Wright, either to fund monthly payments or to pay back the "fronted" money to Defendant, was Wright's drug dealing operations; and that Defendant well knew all of that. Defendant and Wright entered into such agreement for the purpose of making financial transactions for the purpose of disguising the true source of the funds, namely Wright's illegal drug dealing. This transaction and the involved agreements alone are legally sufficient to prove Defendant's guilt as to Count 3 beyond a reasonable doubt.

132.    Postal Inspector Weckerly testified about some of the Postal Money Orders at issue in this case.

133.    Weckerly testified about Exhibits USPS-1, -2, -3, -4 and -4A.

134.    Exhibit USPS-4 was a spreadsheet describing various aspects of the Postal Money Orders at issue in this case.

135.    Weckerly testified regarding Money Orders dated November 30, 2011 that were payable to Defendant from Wright.

136.    Five (5) of those Money Orders (totaling $5,000) were provided to Defendant after she met with Wright in Pennsylvania with her son Randall.

137.    The remaining two (2) Money Orders were sent to Defendant in Virginia shortly thereafter.

138.    These Money Orders were provided to Defendant in blank and Defendant filled out those money orders.

139.    Those Money Orders were paid to Defendant shortly after she and Wright met in Pittsburgh.

140.    These Money Orders were purchased in the Pittsburgh, PA area while Defendant was living in Virginia. The Court finds that they were purchased by Wright with this drug money.

141.    Federal Agent Petrulak testified about Exhibits: KP-1 through KP-6, PNC-1 through PNC-22, BOA-1 through BOA-13, COL-1 through COL-26, HD-1 through HD-12, HDH-1 and HDH-2, AE-1 and AE-2, US-1 through US-12, CM-1 through CM-3, TA-1 through TA-5, SWW-1 through SWW-50, SW-A1, SWP-1 through SWP-14, SWM-1 through SWM-10, PH-1 through PH-9, and PH-10 through PH-132.

142.    Defendant had secured a mortgage toward the purchase of a residential property in Springfield, Virginia where she previously resided separately from Wright. This mortgage was in her name only. A PNC account for that mortgage ended in #6494. Law enforcement personnel discovered a series of twenty-three (23) payments, in increments of $5,000 each, going toward the Virginia property obligations. They were made by Wright.

143.    Some "regular" monthly mortgage payments made relative to this Virginia property were out of Defendant's personal Bank of America bank account. A review of records also demonstrated that additional principal payments of $5,000 per month were also made toward the mortgage on this property. (ECF No. 320 at 177). As noted below, they came from Wright. This monthly payment amount was several multiples of the required monthly payment amount.

144.    PNC Bank statements show twenty-three (23) distinct cash payments going into the Virginia mortgage account held in the name of Defendant only. PNC deposit receipts show cash deposits for eleven (11) of the twenty-three (23) distinct $5,000 deposits. The bank records show

no disbursements from other bank accounts of Defendant or Wright that would correspond to, or account for, the eleven known $5,000 cash deposits into the Virginia mortgage account, nor to the other twelve deposits of $5,000 for which there were no cash deposit receipts found.

145.    The evidence demonstrates beyond a reasonable doubt that there was no legal source of this cash which accounts for these $5,000 deposits; the source was the proceeds of the drug activity of Wright. During the search of the residence shared by Defendant and Wright, nearly $55,000 in cash was found secreted in a variety of locations throughout the residence and an outbuilding obviously used for processing and packaging cocaine, including in envelopes in Defendant's purse, in a cardboard box on the floor in the bedroom shared by Defendant and Wright, in drawers in the bedroom dresser, and on the dresser itself. In addition, various large amounts of cash were found in envelopes in a wide variety of other places in the Wenzell Avenue residence and in the outbuilding/garage area. The Government proved that the source of that cash was in whole or material part Wright's drug dealing operation, and the Court concludes that Defendant well knew all of that, all beyond a reasonable doubt.

146.    During the search of the Wenzell Avenue residence, cash receipts were located indicating that $5,000 cash payments were made toward the principal of the Virginia house loan.

147.    Agent Petrulak testified that he prepared KP-13, a spreadsheet he created from reviewing Defendant's Bank of America bank records.

148.    Agent Petrulak testified that he prepared KP-14, a spreadsheet he created from reviewing a PNC bank account in Defendant's name.

149.    Agent Petrulak testified that he prepared KP-15, a spreadsheet he created from reviewing a PNC bank account in the names of Wright and Tracey Wright.

150.    Agent Petrulak testified that he prepared KP-16, a spreadsheet he created from reviewing a PNC bank account in the name of Wright.

151.    KP-2 is a summary spreadsheet that incorporates KP-13, KP-14, KP-15 and KP-16.

152.    On page 5 of KP-2, the spreadsheet notes third-party check deposits made into the PNC Account held in Defendant's name. Eleven (11) of those deposits are checks from "Pittsburgh Wings III, Inc. – Armstrong's Restaurant" payable to "Dominic Abbandanzo" the drug customer of Wright known as "Dino." The Court finds that these were deposits resulting from paychecks signed over by "Dino" to pay for cocaine he purchased from Wright. These third-party checks were proceeds of Wright's drug dealing, and Defendant well knew that.

153.    Defendant's handwriting appears on two (2) of the Abbandanzo checks; the remaining checks were endorsed in Wright's handwriting.

154.    While Defendant was told by Wright that Abbandanzo was a tenant in one of Wright's rental properties, she also well knew that he was frequently buying cocaine from Wright and paid for it by signing over such checks.

155.    Three (3) deposited checks were endorsed by Defendant.

156.    All the remaining checks listed under third-party check deposits into the PNC accounts in Defendant's name were endorsed in Wright's handwriting. The manner of these endorsements by Defendant and Wright demonstrates the interlocking nature of how Defendant and Wright were operating their financial affairs.

157.    Some of the deposits were made by Wright's signing the endorsement of Defendant's name or, on some occasions, by him depositing into the accounts checks made payable only to Wright.

42

158.    With respect to KP-2, which lists the Money Orders purchased by Wright or Defendant, among other things, there are seven (7) Money Orders listed.

159.    The first five (5) Money Orders were sent to Defendant by Wright in 2011.

160.    The remaining two (2) Money Orders were provided to Defendant by Wright shortly thereafter.

161.    That Wright was personally placing funds into Defendant's accounts to pay her debts demonstrates the interlocking and agreed-upon nature of the financial agreements and arrangements between Defendant and Wright. None of Wright's payments could be traced back to any bank account, which includes any bank account that received the deposit of legitimate earnings of Defendant or Wright. (ECF No. 320 at 217-18; ECF No. 321 at 55-60). Defendant was well aware of Wright's financial transactions as to the Virginia mortgage, their interstate nature, and the source of the funds Wright used to make them, (ECF No. 200-05), that they were intended to and did conceal the source of the funds (Wright's drug dealing) and she accepted and agreed to all of that. The transactions relative to the Virginia mortgage in and of themselves fulfilled each element of the charged offense as to Defendant.

162.    The evidence proves beyond a reasonable doubt the integrated and interlocking nature of the financial agreements of Defendant and Wright to operate jointly in using Wright's drug money to fund their life, and Wright using cash to purchase vast quantities of Postal Money Orders to both disguise the source of funds and to keep them from being traced. The Court finds that Defendant knew all about that plan and agreed to it.

163.    There was evidence presented at trial relative to purchases of household goods, furniture, and motor vehicles.

164.    One vehicle that was purchased was a Chevrolet Avalanche truck for the benefit of Randall Connell.

165.    At least sixteen (16) vehicles (cars, trucks, vans and motorcycles) were purchased during the time period September 16, 2011, through January 3, 2017. For those purchases, $86,950.17 in cash and $9,000 in Money Orders were utilized toward the initial down payments on the vehicles. At the time of the search, at least ten (10) vehicles (5 cars/trucks and 5 motorcycles) were found at the Wenzell Avenue residence. (ECF No. 321 at 213-14).

166.    In eight (8) of the purchases, there was application made for financing to cover some portion of the purchase price. In six (6) of those eight (8) financings situations, the payments that were actually made were accelerated and the involved loan was paid off earlier than the scheduled maturity date, often significantly earlier. In one (1) of the eight (8) situations, no records were available to show the status of the loan payments or payoff (e.g., the March 31, 2014 purchase of a 2012 Kia Optima—$9,500 financed through JPMorgan Chase). In the last of the eight (8) referenced situations, it appears that the search involved in the investigation of this case intervened and that a motorcycle purchased was not paid off (e.g., the purchase by Defendant of a Harley Davidson motorcycle). In five (5) of the six (6) situations where payments were accelerated and the loans were paid off early, Money Orders (paid for with cash) were used as part of the early payoff. In the situation in which Defendant's motorcycle was not paid off, the record shows that Money Orders were being used as part of the incomplete payoff activity. A total of $37,901.80 in Money Order payments were utilized in the loan payoff activity.

167.    These uses of Money Orders were part of the plan and scheme used by Wright and agreed to by Defendant as the means and method by which Wright's drug dealing proceeds would

be laundered via cash and Money Order purchases to benefit the common life and household of Wright and Defendant. It was the "M.O." of the conspiracy, used in a variety of financial transactions as detailed herein. (ECF No. 321 at 5-11).

168.    For each of the vehicle loans for which records were presented at trial, the payments on those loans were accelerated and the vehicles were paid off in advance of the maturity date of the loan, at times as much as nearly four years ahead of schedule.

169.    In those circumstances where vehicles were purchased, in part, through loan transactions via various financial institutions, the loan application, payment schedule, monthly payment due and maturity date of the loan, taken together with the other evidence demonstrates beyond a reasonable doubt that the intention of Wright and Defendant together was to facilitate the use of the pool of cash derived from drug sales proceeds and inject it into the stream of commerce in a way that cloaked the payments (typically via Postal Service Money Orders paid for with cash) generating the appearance of legitimacy. And these financial transactions were made in furtherance of the conspiracy charged at Count 3, and during the conspiracy.

170.    At the time of the purchase of the Avalanche truck, Randall Connell was attending school and was dependent on his parents (Wright and Defendant) for financial support. He did not have the resources to purchase $9,000 in Money Orders nor to provide $7,700 in cash, each a sum used toward the purchase of the Avalanche.

171.    In regard to the purchase of this Avalanche truck, Wright and/or Defendant visited a number of different Postal Service locations, all on December 16, 2016, and purchased nine (9) separate Postal Money Orders, each in the denomination of $1,000. The pattern of activity as to the purchase of these Money Orders demonstrates beyond a reasonable doubt that it was done in a

manner designed to avoid generating identifying information about the purchaser to the Postal Service clerks who sold the Money Orders. Those Money Orders were then applied, along with $7,700 in cash, to the purchase of the Avalanche truck. These financial transactions also affected and were in interstate commerce and were structured to disguise the illegal source of the funds, i.e., Wright's drug dealing. These acts were committed during and in furtherance of the conspiracy charged at Count 3.

172.    The Defendant wanted a Harley-Davidson motorcycle and Wright wanted to support her getting it.

173.    Defendant was aware that a cash down payment of $9,000 on the motorcycle was made with Wright's drug money and she planned on financing the remaining balance on the motorcycle.

174.    Defendant personally signed the motorcycle credit application involving a bank promissory note obligating herself, and no one else, to make 60 monthly payments at the rate of $277.96 per month until full payoff was achieved in order to buy that motorcycle. There is no evidence of any of these payments coming out of the personal bank accounts Defendant had during this time period; payments instead were in $1,000 increments throughout 2016, stopping in 2017 concurrent with the law enforcement search in this case. These payments were generated by cash derived from Wright's drug sales, of which Defendant was well aware. Defendant was an active and knowing participant in the money laundering represented by the credit applications/accelerated payments using cash or cash-purchased Money Orders in combination with the $9,000 cash down payment she put on the motorcycle with the active engagement with and involvement of Wright.

175.    Wright paid for the motorcycle using his money, even though none of the paperwork reflected his involvement; it instead stated that the purchase was Defendant's alone. This purchase, using Wright's drug money, was the result of an express agreement between Defendant and Wright to make that purchase with Wright's money generated by his drug sales and to disguise the source of such funds by her being the "owner" of the motorcycle via the relevant paperwork, and Defendant knew all of that. The actions and knowledge of Wright and Defendant in these regards demonstrate beyond a reasonable doubt that the motorcycle purchase and other related financial transactions fulfilled each element of the charged offense as to Defendant. This financial transaction, and its mechanics, was expressly agreed to by Defendant, well knowing that the cash and Money Order transactions in which Wright was involved were funded by his drug dealing operation, using either such funds exclusively or funds commingled with funds from his modest legitimate income.

176.    The documentary evidence generated as to the purchase of the motorcycle, demonstrates beyond a reasonable doubt the common agreement and actions by and between Defendant and Wright in furtherance of that agreement at least as follows:

a.    Defendant agreed to purchase a Harley-Davidson motorcycle on March 16, 2016, putting down $9,000 in cash. (Ex. HD-9). This cash is not accounted for by any transaction arising from or relating to any of her bank accounts.

b.    The credit application for this purchase lists Defendant as the sole applicant. All the information provided (employer, salary, social security number, date of birth, driver's license number) pertains to Defendant alone. The application lists no joint applicant and contains no information concerning Wright. (Ex. HD-10).

c.  Defendant testified that she did not pay of the motorcycle and had no intention of doing so. She bought the motorcycle knowing and agreeing that Wright would pay for it.

d.  A Postal Service Money Order dated April 5, 2016, in the amount of $1,000, in Wright's handwriting, contains the account number related to Defendant's motorcycle purchase. (Ex. USPS-4A). This document is contemporaneous with the motorcycle purchase and demonstrates that Defendant would not be making the first payment on the loan represented by the credit application and the promissory note. Instead, consistent with the pattern and scheme established by the payment for the Florida house and other vehicle purchases, the payments were from a cash source tied to Wright and which accelerated the payoff of the motorcycle loan.

177.  The Court finds beyond a reasonable doubt that the motorcycle purchase documents, and above-described processes, demonstrate deliberate and purposeful arrangements by and between Defendant and Wright to cloak the true purchaser and source of payment funds to conceal their true source, namely Wright's drug sales operations and as to all of which Defendant was well aware. This was an unlawful and consummated agreement in furtherance of a common purpose between Wright and Defendant to launder illegally obtained money from Wright's known illegal drug dealing. The Harley-Davidson motorcycle purchase transaction alone fulfilled each element of the charged offense as to Defendant.

178.  The Money Orders employed in the purchase of vehicles and the after-accelerated payment of loans on vehicles (as well as the money orders utilized for realty purchases, furniture purchases and otherwise) were all purchased with cash. The record contains an exhaustive

48

detailing of moneys spent from the various bank accounts of Defendant and Wright. The source of funds for the purchase of those Money Orders was not these accounts. It was cash which the Court finds was generated by Wright's drug dealing operations.

179.    The use of the cash and Money Orders in the purchase of the vehicles and use of the Money Orders in payments on the loans taken out had the effect intended by both Defendant and Wright, namely the disguising of the nature and origin of the pool of cash and its source of it and by which the purchases were actually being made, namely, Wright's illegal drug dealing.

180.    The evidence in this case establishes that all involved PNC Bank accounts were controlled by Wright and were used to facilitate and carry out the common agreed-upon plan and scheme of Defendant and Wright to move or "launder" the cash Wright generated by his drug dealing. The fact that one or more of such accounts was not in Defendant's name further demonstrates the interlocking nature of the financial dealings of Wright and Defendant, in that the evidence proves beyond a reasonable doubt that Defendant was actually aware of the involved purchases, the values of the same, that she was benefitting from them, that Wright was paying for them with sources outside of his bank accounts, all in the context of the drug dealing operations and its proceeds, all of which were matters squarely before Defendant and to which she agreed.

181.    The evidence considered as a whole establishes that Defendant participated with Wright in arranging for the cash and Money Order transactions. The Court finds beyond a reasonable doubt that, while Wright received some legitimate proceeds from rental properties and Social Security checks and Defendant also had her own income from her employment, Wright and Defendant each knowingly made or permitted the deposit into the involved bank accounts at least

approximately $200,000 in drug proceed funds, which were then used to pay for and toward the Florida house, payments on the Virginia mortgage, the Avalanche, the motorcycle and various other vehicles, goods and debts. And the cash generated to purchase the involved Money Orders and/or to make loan deposits or payments could not be traced back to any deposits of legitimately acquired funds into and then from bank accounts of Defendant or Wright. (ECF No. 321 at 62-63).

182.    The testimony regarding the financial transactions in this case credibly presented a clear picture of a financial operation of significant magnitude, with dollar amounts visibly exceeding any legitimate earnings of Defendant or Wright, including approximately $120,00 toward the Florida house and $70,000 on the Virginia mortgage, with loan payments totaling $115,000 in cash and $159,000 via Money Orders. (ECF No. 320 at 205). In total, there was at least $394,000 in cash and Money Order payments outside of any known bank accounts of Wright or Defendant. (ECF No. 320 at 206). The Court finds that there were no known legitimate sources for the bulk of these funds, and that these funds must have been the proceeds of Wright's drug dealing operation.

183.    In addition to any legitimately obtained funds by and of Wright and Defendant, proceeds from Wright's drug dealing were deposited in his and on multiple occasions Defendant's accounts via Wright, and drug dealing proceeds were used by Wright to make up the cash and Money Orders he used to reimburse Defendant for the Florida house down payment per their express agreement, and to pay for goods and services for her or for her benefit, including toward the Florida home and various motor vehicles.

184.    Purchases of furniture were also made in the name of Defendant by using cash. The invoices for transactions in Florida referenced the Florida address of the house that Defendant and

Wright purchased together. Exhibit SWW-25 shows cash payments of $743.44 and $2,100, on April 15, 2016, at a furniture store for items that include "side chairs" and "table" and "buffet," items purchased for refurbishing a house one intends to occupy. Exhibit SWW-28 shows a cash purchase on April 14, 2016, at a Sam's Club store of a television and an additional piece of equipment, with total cash payment of $1,541.06. This follows the use of $9,000 cash to purchase a motorcycle by Wright for Defendant on March 16, 2016. At or near this same time Wright was buying furniture in Florida via cash and checks (Ex. SWW-30 (Oct. 30, 2015, Rooms to Go furniture—$2,997 cash, $3,000 VISA credit card); Ex. SWW-31 (Oct. 31, 2015, Rooms to Go Furniture—$500 cash, $2,064.49 check); Ex. SWW-32 (Jan. 15, 2016, Rooms to Go furniture—$1,500 cash, $356.28 VISA credit card)). This evidence demonstrates cooperation and communication by and between Defendant and Wright involving the use of cash and the generation and funding of financial transactions jointly by and between Defendant and Wright.

185.    Contrary to Defendant's arguments that she was uncertain to what was occurring relative to voluminous payments and transactions in cash and Money Orders made by Wright, as set out below the reality is that she knew exactly what was going on, and any of her testimony otherwise is not credible. (See ECF No. 321 at 198 ("Not – I don't know. Mostly Richard bought the money orders. I don't think I ever purchased a money order from the United States Post Office in my life.")). The detail demonstrated by the bill payments and handling of cash necessary to accomplish what the records demonstrate took place relative to the incurring of expenses of and their payment on behalf of Defendant or of her and Wright together. This demonstrates that either Defendant was informing Wright of the necessity to have him pay bills and then handle financial matters in a timely and efficient manner *or* she was aware that he was handling such matters on

51

her behalf via the route of Money Orders/cash. (See ECF No. 321 at 24-30). Either way, the Court finds that Defendant had actual knowledge of the scope and actions of Wright in furtherance of their agreement to conceal that the source of funds to make the purchases set out above were the proceeds of Wright's drug dealing. It was obvious and occurred right before her eyes, even if she did not know the precise details of any particular singular act of Wright.

186.    Defendant elected to testify under oath at trial. (ECF No. 321 at 155-217). In large measure, her testimony consisted of general denials of any knowledge of the source of the large amounts of cash used by Wright to pay various expenses and to buy Money Orders, along with vague and general statements of lack of knowledge of many of Wright's actions, and the use of his money. She specifically denied engaging in any money laundering activity. The Court makes the following additional findings from Defendant's own testimony, considered on its own and in the context of the balance of the evidence that the Court credits, and the inferences that Court draws from all the evidence, including Defendant's testimony.

187.    From Defendant's testimony considered as a whole, the following was established by Defendant's testimony at trial.

188.    First, Wright bought two (2) motorcycles for Defendant, paid for them with his money, and gave them to Defendant for her to use as her own, which she did. And they were stored at the Wenzell Avenue house where they lived together.

189.    Defendant admitted that she personally purchased at least some Money Orders for the payment of household expenses and purchases. (ECF 321 at 198).

190.    Defendant admitted that she and Wright jointly purchased and owned a Chevy Express G-15; that it was titled to both of them together; that Wright paid for that vehicle with his funds; and that all of this occurred with Defendant's actual knowledge. (ECF No. 321 at 195-96).

191.    The Court credits Walter Amman's testimony that Defendant was personally present with Amman and Wright when Wright made drug sales, that such occurred shortly after she moved back in with Wright upon her and Randy Connell's return to Pittsburgh, and that such drug sales were in plain view of Defendant. In addition and notably, in her testimony at trial, she admitted that in an earlier effort to gain/increase support payments, she admitted that she actually endeavored to show that Wright was a drug dealer when he asserted only limited assets for such purposes, all in an effort to boost those support payments. (ECF No. 321 at 185-86). Further, she was actually well aware that Wright was making very substantial "overpayments" each month on the Florida house mortgage and the Virginia mortgage yet could not attribute the funds for such to any legitimate source of income on his part, other than her generalized assertion that Wright had some rental properties. (ECF No. 321 at 202-04). The Court finds Defendant's testimony that she was unaware, or uncertain, of Wright's drug dealing or that it was the source of his extraordinary monthly mortgage payments for the Florida house they agreed to purchase, and her Virginia home, to be wholly incredible. She saw that illegal activity, and she actually knew what was going on as to Wright's source and use of the funds derived from it, and affirmatively agreed to his making those payments.

192.    Defendant admitted that she became aware that Wright was using Money Orders at a rate of $5,000 per month to pay the mortgage on her Virginia property. Given the size of the payments, Defendant's obligation to otherwise make those payments which was an obligation

defeased by Wright's financial transactions, and the overall volume of the payments, the Court finds Defendant's denial of knowledge that the payments were made, or of the certain source of the funds for those payments (Wright's drug dealing) incredible, especially since Defendant well knew for at least part of the time that those payments were made, Wright was making them while he was a major drug dealer. This is buttressed by her own testimony that before the search warrant raid at her home, she was stealing cocaine from Wright and that she had attempted to prove that he was a drug dealer to increase support paid to her.

193.    Defendant's denials of knowledge of Wright's drug dealing in response to her own lawyer's questions were undermined by her testimony that she was "very suspicious [of Wright's illegal activities] for a long time," but it took her time to come out of her own denial. The Court finds that she was in that time period knowingly aware of Wright's illegal drug dealing and the proceeds it generated and which he used to make the financial transactions he and Defendant agreed to have made, or she was willfully blind to what was happening right before her eyes: Wright was selling cocaine, gleaning payments in cash (along with checks signed over to him by "Dino"), and was then using those proceeds to buy things for Defendant, to pay down the mortgage on Defendant's Virginia house, and to fund their agreed-upon joint purchase of the Florida house. In the Court's judgment, Defendant actually knew that such was all happening, or she took affirmative steps to make sure that she did not learn the actual details of what made her "very suspicious for a long time" as to all of Wright's actions. And she was in this actual state of mind months before the search warrant raid on the home she lived in with Wright.

194.    And Defendant eventually admitted on cross-examination that she was aware of the Money Order payments on the Florida house, the payments toward her Virginia home, and that

she was aware of those financial transactions were being made by Wright for her benefit and with the proceeds of Wright's drug dealing.

195.    Defendant also admitted in response to questions from the Court that in the garage of the house she lived in with Wright there were five (5) cars/trucks, along with five (5) motorcycles, all paid for by Wright. And she stated that while at first Wright told Defendant that "he had rental properties," it "then became apparent that, you know, he was not being honest with me." The Court finds that in the context of all of the evidence in the record that this means that Defendant actually concluded that Wright was dealing drugs, and was using the proceeds to buy those many vehicles with the drug proceeds, and that some of those vehicles were purchased at the request of Defendant as part of her agreement with Wright as to how drug proceeds would be spent, and this is especially the case as to her two motorcycles and the Chevy Avalanche purchased for Randy Connell. The Court concludes that Defendant well knew exactly what Wright was doing, had asked him to do it for her benefit and that of their son Randy, and that such arrangement constituted an agreement between them to execute financial transactions involving drug proceeds and in and affecting interstate commerce and made for the purpose of concealing the source of Wright's money.

196.    Defendant's statements that she did not know where Wright was getting his money for the mortgage payments and vehicle purchases is simply incredible in light of her specific admissions, and the overall context of what was occurring before her very eyes, over a significant period of time.

197.    The amount of cash and Money Order transactions reviewed and analyzed in the course of the investigation in this case and referenced in the evidence of record ($351,240 in cash

transactions, $186,675 in Money Order transactions for a total of $537,915) far exceeds any source of legitimate income of Wright or Defendant, individually or combined. Deposits to Defendant's individual accounts from the Virginia law firm totaled $230,225.85, Social Security deposits for Wright to the involved various accounts totaled $13,188. Income from rental properties directed to Wright and deposited to the involved accounts totaled $13,640. The investigation identified other deposits totaling approximately $91,000. At best, legitimate bank deposits totaled $348,053.85. This results in a difference of at least $189,861.18, which the Court finds beyond a reasonable doubt included the proceeds of Wright's illegal drug dealing operation and such funds were comingled with any legitimately derived funds. And the Court uses the phrase "at least" recognizing that it is likely far more, as there were not bank records backing up the generation/transfer of cash, nor the purchase of Money Orders, and showing that those much larger amounts had any source in the bank accounts of Defendant or Wright into which "legitimate" income would be deposited.

198.    Beyond a reasonable doubt, all of the cash and money order expenditures of Defendant and Wright must be accounted for by a source of cash, and the Court concludes that the substantial portion of them, at least, was cash generated by Wright's drug dealing operation and that such was plainly obvious to Defendant, and she well knew it.

199.    Evidence relating to Defendant allegedly being compelled/forced/coerced into opening one or bank accounts she alleged did not want or need, and her alleged reluctance regarding the same, rather than exonerating her, serves to validate and confirm that she was well aware that Wright was entangled in illicit drug dealing activity and that she and the financial transactions she knowingly and personally engaged in, or was well aware Wright was engaged in

for her benefit, were necessary, actual and integrated financial components of such illegal activity, and she knowingly agreed to and benefited from them.

200.    In light of the persistent and close relationship between Defendant and Wright, and the demonstrated arrangements and agreements between them to have, and which did have, substantial funds available to Wright (for Defendant's benefit) at all times for a wide variety of cash and cash-derived Money Order expenditures, the Court concludes beyond a reasonable doubt that Defendant was well aware of the circumstances of how such cash was illegally acquired by Wright when she knowingly accepted the benefit of cash and Money Order deposits/payments/expenditures both to her and for her benefit, and, in some circumstances to their joint benefit, and that at all times Defendant acted with this actual knowledge, and agreed with Wright as to the nature and purpose of such transactions.

201.    Based on its consideration of all of the evidence, the Government has proven beyond a reasonable doubt that Defendant knowingly benefitted from Wright's financial support, it was provided pursuant to an agreement between them with that intended purpose with her knowing full well and beyond a reasonable doubt that it was generated by Wright's drug dealing and those financial transactions were structured as they were to conceal the true source of the funding for the overwhelming majority of them, namely Wright's drug dealing. Defendant agreed and conspired with Wright to conceal his illegal drug proceeds, and which were used for financial and other transactions in money derived from Wright's illegal activities, all in and affecting interstate commerce, and all with her knowledge.

202.    The Court finds Defendant guilty of the charge at Count 3 of the Indictment, beyond a reasonable doubt.

203.    Appropriate further Orders shall issue.


                                        s/ Mark R. Hornak
                                        Mark R. Hornak
                                        Chief United States District Judge

Dated:   November 6, 2024